Good morning. May it please the Court, my name is Rick Rude. I am appearing here this morning on behalf of DHX, DHX, and the freight forwarder and shipper to Hawaii. This appeal arises out of the actions of two ocean carriers that control vessel services to Hawaii. Manson Navigation and Horizon Lines established rate structures that were highly discriminatory and destructive of competition, thereby freezing DHX and other forwarders out of the Hawaii trade. Could you, before you get too far into your argument, tell me, help educate me, I'm not familiar with the ocean carrier aspect of regulation and competition, but there's certain elements of what would be considered a traditional antitrust claim floating around here. What's the interplay between the antitrust laws and the STB jurisdiction over this? The antitrust laws are fully applicable to the domestic offshore trades. The statutory revisions of the ICC Termination Act in 1995 consolidated jurisdiction in a surface transportation board, and the Section 15 antitrust provisions under the Shipping Act at the Federal Maritime Commission were no longer applicable. The domestic trades are oligopolies. Right, so you framed your, you didn't frame your complaint as an antitrust violation per se, you argued it was price discrimination. The actual nature of their pricing practices is a form of parallel pricing. Conscious parallelism. Yes. Right. This appeal is from a decision of the board that Congress intended to allow tariff malpractices in the regulation of ocean transportation services, and therefore, unreasonable discrimination was no longer prohibited. The board did this even though the National Transportation Policy commands the board to prevent destructive competition and discriminatory rates. The board concluded that it lacked jurisdiction over discrimination issues, and that Mattson and Horizons' actions were prudent business responses to a competitive threat. The board summarily dismissed DHX's rate reasonableness claim, concluding that the rate claim was not a rate claim, but a discrimination claim. Under the board's modified hearing procedures, the board accepted all of DHX's factual contentions as true. DHX applied traditional comparative rate analysis to the evidence, showing that DHX had damages of $12 million from Mattson and $7.5 million from Horizons. The board further refused to entertain the rate claim, contending that the board was establishing new rate analysis standards in an unrelated case. That case, called the GovGuam case, is now in its ninth year before the board and has yet to reach the initial discovery phase. The GovGuam case does not involve the board. The board did not address several key issues raised by DHX, specifically the discriminatory absorption of warfage charges and the issue of deceit. DHX suffered an additional $11 million in damages from the unreasonable warfage charges collected by Mattson and Horizon lines. The record is sufficiently developed before the board, and DHX is specifically seeking remand to require the board to address these issues. So if you didn't have, maybe let me pursue my original question, if you didn't have STB and you were framing this as a traditional Sherman Act or Robinson-Pattman or whatever other antitrust law you care to invoke, how would you frame it? What would be the, what antitrust statutes would you bring to bear on this? Well, Robinson-Pattman wouldn't apply because it only involves prices related to the sale of commodities, so we have service. You would have a refusal to deal. However, you then run afoul of the common law duties of common carriage, which require equality of treatment and require service upon reasonable request. So you have a statutory and a federal preemption problem. The Interstate Commerce Act and its subsequent revisions are generally considered preemptive of all other federal claims unless the act itself does not provide a remedy. In this case, the way the ICC Termination Act is structured, the national transportation policy has been interpreted by the courts to apply to discriminatory rating under the rate reasonableness statute. This court has also applied the filed rate doctrine and interpreted it to require the equality of treatment and the prevention of discrimination. So under the reasonableness standard, you get the equivalent of a rule of reason analysis that you would bring to bear under a Section 1 or a Section 2 claim? That's correct. And so is your argument that STB basically has ruled out those kinds of antitrust equivalent claims by its interpretation of the statute? That's correct. They have more or less taken the position that that sort of conduct is no longer prohibited under the transportation regulatory statutes, and therefore, it becomes permissible. The act, however, retains other provisions, including the common carrier duties of equality of treatment, the non-discrimination requirements under the filed rate doctrine, and the reasonable rate requirements, which is fundamentally an excessive pricing situation. The Board never even addressed any of those statutes. They simply took the position, well, it's no longer prohibited, our hands are tied. The situation that we have here, aside from the $11 million of the improper imposition of orifice charges, is the issue of deceit. One will find that misrepresentation and deceit are precluded under a number of federal regulatory statutes. In this case, the Board did not even address this issue. The carriers had something called memorandums of understanding or MOUs, which were actually loyalty contracts under traditional transportation law. They withheld the public information regarding the fact of these MOUs, thereby enabling them to deny that they were engaging in volume pricing. The fact of the matter is the shippers that were afforded MOUs ended up with a rate advantage in excess of that offered to DHX. What we are seeking by this petition is to have the Court vacate the decisions from May 2003, December 2004, and June of 2005, and remand this matter to the Board with the instruction for the calculation of damages under the comparative rate methodology in light of the fully developed record, to remand to the Board with the instruction for the calculation of damages under DHX's unreasonable practice claims, and to require the Board to render a decision on the deceit and morphage absorption issues. I would ask that I reserve five minutes for rebuttal. Certainly. Thank you. Counsel? Sir. I have a question. Certainly. Now, my question is this. Actually, two questions. One is, did your clients urge to the STB that  they were, in fact, exchanging prices, which the carriers admitted to? The carriers further admitted to consulting each other on the interpretation of their tariffs. They admitted to engaging in price management. But what I'm asking is whether, in your briefs to the Board, your client contended that the practices of the shippers were violating the antitrust laws or antitrust law policy. The Board would not have the general authority to recognize that sort of claim. I think Judge Gould is asking something a little more specific. Obviously, you didn't claim any violation of antitrust law in your presentation to the Service Transportation Board, right? No. You didn't? It would not state a claim under the regulatory statute. Right. So you didn't, right? Yes, sir. Okay. Now, the second part of his question is, did you urge any violation of antitrust policy? In other words, sort of the economic terms that Judge Fish has been talking about. Did I get your question right, Judge Gould? Okay. That's right. We urged a reduction in competition, which comes under the destructive competition standards in the national transportation policy due to the various activities, which included the tariff watching, the matching of the prices, the identical tariffs, the fact that out of Los Angeles, the carriers entered into reciprocal service agreements, which then resulted in the reduction of vessel capacity, which is the equivalent of a reduction of supply. It comes under the term of a rationalization agreement. The Board said it's a vessel sharing agreement. The contracts that were executed represent that they were carrier-shipper relationships. So in that context, we presented to the Board a very strong case that there was a serious adverse impact on competition, not only as to the relationship between Horizon Lines and Matson, but the fact that freight forwarders provide the only competitive alternatives to these two carriers in the Hawaii trade. The pricing actions of the carriers excluded forwarders from competing for full container load cargo, and in that manner, they resulted in a total elimination of competition. A destructive competitive practice is a practice which is undermines the ability of an alternative mode of transportation to compete for business. The four different modes are rail, motor, water carriage, pipelines, and pipelines has its own thing, but freight forwarders. So by putting the freight forwarders out of the market, they in effect destroyed the competitive market in the Hawaii trade. A final question. As far as your clients are alleging price discrimination, the Supreme Court recently hasn't been very interested in price discrimination unless the prices are below cost. So did you allege that the pricing actions of the freight forwarders given the volume shippers was below cost? No, sir, we did not. The resulting price structures resulted in a multiple tier rate structure. The MOU shippers, those that had these undisclosed volume guarantees, rebating, rate freezes, had the lowest rates. The published information intermodal shippers with what we call door rates, which would be from a shipper's door to a port in Honolulu, had the next level of rates. The next level of rates above that were the regular port to port, no volume required commodity rates. The next rates above that were the consolidated cargo rates which were offered to the forwarders. The only rates that exceeded that were what they call FAK, freight all kinds rate, which is the equivalent of a general cargo rate and is considered to be the absolute maximum highest rate in the tariff. I can say that all regular full container load commodity shippers would have a better rate than a freight forwarder because the freight forwarder would have to put his own operating costs on top. He was only able to offer the public tariff rate. They were excluded from volume pricing. The net effect of excluding a freight forwarder from volume pricing is also to exclude the small and medium sized shipper from volume pricing, and especially the less the container loads. It institutionalizes an economic dislocation, even among the shippers of the public, little store, big box. When you assure yourself that the little store is not only going to pay a higher price, but his service provider is going to be required to pay a higher price, you have in fact indirectly impacted competition and the island economy. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court, I'm Craig Keats for Respondents, Surface Transportation Board and the United States. Judge Fischer, Judge Gould, I will get to your questions in just one minute, if I may, for about 30 or 45 seconds, just to give an introductory remark to put the case into context. The Interstate Commerce Act has been in place for over a century. Some of the provisions have remained essentially the same, some have changed, and some have been repealed. But the one thing that's very clear from all recent legislation is that the price equalization regime that was in place in the 1930s and so forth is no longer favored because that approach to regulation brought the railroads to ruin. It made the motor carriers fat and happy. And essentially in the Staggers Act, the Motor Carrier Act, and every ‑‑ virtually every other piece of legislation that's been passed in the last 30 years, Congress has used words like efficiency, competition, innovation and so forth. And Congress has in fact explicitly endorsed the types of targeted discount provisions that are at issue here and that are in fact claimed to be per se violations of the statute. Judge Fischer, you asked about ‑‑ Roberts. Well, before you get to that, I do want you to get to that, get to Judge Fischer and Judge Gould's questions, but what do we do with the issues that the STB did not reach? We have a deceit issue that we have no decision on. We have the warfare discrimination issue, the MOU issues. What do we do with those? Essentially what the board found is that all of them amounted to the same point. Where does it say that in the opinion? It said we don't have to get into every one of those little factual nooks because they all come down to the same basic issue, which is that someone else got a better rate than I got, and therefore I'm entitled to relief. And so the board, like this So where does it address that? Where did the board address the deceit issue anywhere in its opinion? It did not in its opinion say I've looked at the testimony of the two parties and I find that the one party is correct and the other is incorrect. Well, no. Where did it say that we reject the deceit contention on legal grounds? It said in its 2004 decision that all of those types of issues come down to the same point. Well, it doesn't say deceit anywhere. It doesn't deal with deceit unless we try to read between the lines. Isn't that true? That's correct. All right. That's correct. And the same thing with the discrimination issue with respect to the MOUs. The Costco, for example, was one example given with discriminatory pricing with Costco on these MOUs. Again, not dealt with in the STB. It did not address specifically whether the MOU was offered to the DHX or not. It said it doesn't matter because this is essential. Well, it didn't say it doesn't matter. It didn't address the MOU and say it didn't matter. It just said what you're asking us to do is to construe the decision. And maybe it's a fair construction. But construe the decision as reaching issues that it didn't seem at least to me to reach. Right? I think if you read the decision, as I read the decision, you can certainly say, as I would say, that the board said all of those factual issues come down to the same point. But they aren't factual issues. It's a legal theory. And you may say we reject the legal theory for this basis or this basis. And you may well be correct. But if I concluded otherwise, wouldn't you agree the proper remedy would be to remand to the board to have it decided in the first instance? If you conclude that there are legal issues. There are legal issues that needed to be decided that weren't decided, then, of course, you need to have the board decide those issues. You wouldn't prefer, as urged by your opponent, that we decide it in the first instance and give the board instructions, right? No. I don't think that the courts are supposed to be doing that. Okay. I deterred you from answering Judge Fischer's question, so please go ahead. I do think, though, it is essentially a failure to state a claim that the board ruled on, and as this Court did in Alliance that we cited in our brief at page 33, you don't need to go into all those alleys if, in fact, there's no basic claim to be had. And that's what the case really boils down to. Judge Fischer, there is some overlap between antitrust and STB. In Alliance, this Court found that the antitrust laws remain in effect even though the Interstate Commerce Act is also in effect. There are some things that can't be brought under the antitrust law, such as great reasonableness. That's within the STB's primary and exclusive jurisdiction. There are some issues that are somewhat overlapping. So parties do bring these types of cases in one form or the other. And sometimes the courts will reject these regulatory claims if they're brought as antitrust claims. And that's what happened in Alliance and also in Judge Ezrid's decision in the Sealand case that we cited in our brief also. Sometimes they'll say you can't bring that under the antitrust law. But the one thing that in all of these antitrust cases, the rule that's established is that you can't make a per se allegation and survive a rule of reason type analysis. And that's exactly what happened here. DHX throughout this case came in and said under one theory or another throughout the different aspects of the phases of the case, okay, somebody got a better rate than I got, therefore, I have a per se claim under, first, the rate reasonableness provisions, second, the reasonable practice provisions. That has not been the rule, the way the system works, since certainly the 1980s when all of these targeted discounts were challenged in motor carrier practice as unreasonably discriminatory. Let me just make sure I understand. The extent to which you have an oligopoly at work here, which controls a major form of trade between the mainland and Hawaii, so that there's a consumer interest clearly at stake, the higher prices that they would have to pay for goods shipped under a monopoly or oligopolistic pricing mechanism, if the board felt that the carriers individually or together in a section one type of arrangement were trying to drive out a competitor so that they could then raise rates, exact a monopoly or oligopolistic price on the transportation. And that was their ultimate objective. The board, by deciding there isn't a so-called price discrimination jurisdiction or remedy, I'm not sure how all those fit together, but the board would still be able under the reasonable rate regime to address the anti-competitive, anti-consumer impact of such an allegation. Is that correct? The board would be able to do that under the unreasonable practice regime, not the rates levels per se. It would be an unreasonable practice. They're not disclaiming the ability to address what would in a straight-up Sherman Act claim or Clayton Act would be is still within their ambit of addressing, but as the regulatory agency and under the regime that's peculiar to the interstate commerce  Is that correct? Our board would not disclaim that authority. And, in fact, the first decision, the 2001 decision in which the board denied a motion to dismiss and found that the complaint was barking up the wrong tree, but that it wouldn't dismiss. And it said it sounds like what you're trying to argue is that the board is doing the carriers are trying to do just that, and if that's the case you want to make, you can come and try to make that kind of a case. But, in fact, the carriers, the DHX did not make that kind of a case. It made a per se case. The board also did in its 2004 decision find that, in fact, DHX had not been shut out of the business, the full container business. Its business had improved since the complaint. The board found that it was making more profits after than it was before and so forth. And even as far as your oligopoly point goes, there is entry and exit in this market. There are two major carriers now. The Maritime Administration report that we cited earlier, which is public, talked about the moving of carriers in and out, entry and exit. And, in fact, there's a Marad report of 2006 that confirms that there's been a new small entrant. We concede, however, that these two are the big guns in the trade, but there is entry and exit in this business. Judge Gould, you asked about whether DHX really made this kind of an antitrust case. I would argue it made the noise, but it didn't make the proof. It asserted antitrust-type violations. It asserted that the vessel-sharing agreement which the carriers entered into was anticompetitive, but it didn't show that any bad things had happened to the market. Judge Ezra, in the Sealand case, found that this type of a vessel-sharing arrangement between these two parties was, in fact, pro-competitive, not anticompetitive. There wasn't a showing made of the type that you need to make under the antitrust laws. That's really been the whole difficulty with resolving all of these issues that you're talking about, Judge Thomas, is that it's all thrown out there. But at the end of the day, there's no proof. Well, it would have been nice if you'd addressed that specifically in your brief, because they did raise the seed, they raised all these issues, and you didn't respond. In the brief we did. I don't think so. You didn't address the failure of the STB to address the issues. You said, well, they're all gone. Everything's gone. But I searched your brief. The interveners, the real party in interest, addressed it. Well, I think that what in our brief we said is that it all came down to the same – I'm going to make the same point I made before. It all came down to the same point, that there's a per se rule that if someone else gets a better rate. That's why all those things were raised. The so-called proportional rate issue says it's not really a proportional rate and somebody else got a better deal. Well, what you just said is nowhere to be found in your brief. You didn't say, well, the seat's off the table, the warfare discrimination is off the table because they're subsumed. You could have taken that in a paragraph and I would have understood your point and cited the portion of the order that said that. Well, I can tell you that's in the 204 order where the agency said it all comes down to the same point, which is differential treatment is a per se violation. Now, were you going to allow Batson to argue? Yes, sir. I can do that now. You've got about eight minutes left. Thank you, sir. Judge Thomas, it may have pleased the Court. I'd ask leave of the Court to substitute Mr. Fleisig of my office. Mr. Fleisig is a member of the bar of this Court. Thank you. Thank you, Your Honors. And I will be brief. I have, I think, at least just three points that I'd like to make here today to set out some of the commercial atmospherics that have been presented to you. In the first instance, we have heard today, as we heard below, that appellant claims that they were completely eliminated from the full container load market. That is, I can't say it any other way, is that it simply was not true. As we showed below, and I've reached to this Court, and in six record on appeal, their revenues, both the consolidated revenues and their full container load revenues continue to grow. And as a matter of fact, since the acts alleged against the interveners here, they landed their single biggest full container load account, Ross Stores, direct the Court's attention to three record on appeal, 829. That new account, I believe, accounted, by appellant's own claims, 47 percent of their full container load business. This was new business they got after they come and claim that they were eliminated from the full container load market. Furthermore, in their own documents, they still have still affirmed that there is a profit margin to be made for them. As a matter of fact, they claim that they could make $500 per container using Mattson's rates in an effort to sell full container load business. Once again, I think you'll find that in our brief below, which would be six record on appeal, about 1758 in the record. Two other points that need to be made. One of the atmospherics is that appellant claims that we just said no to DHX, that that's all Mattson or my client, Horizon, did was say no. In fact, we did say no to rate requests for them. We said no to other shippers' rate requests for discounted rates. We said no to other shippers' requests for volume rates. We also said yes. We said yes to DHX time and time again. And as the board found, they were the benefit of favorable rates from Mattson and Horizon when it made commercial sense for us to do so. And I think that flows into my next point is that the board found our conduct to be reasonable. And what's important about that, when they held that it is not an unreasonable practice to act in a manner designed to protect its, meaning Horizon's, profits and its market share from diversion to its competitors. In fact, I think they said that we were prudent. And that is found at nine record on appeal, 2502. What this means to us, what we as Horizon means to us, is that even if this case was brought before the STB or then the ICHC in 1994 and not 2004, our conduct because it was deemed to be reasonable, and the court, as sparse as you may feel that order of the STB to be, they did find that our conduct, we believe that they found to be reasonable. And as, and because it was reasonable, even if this case was brought before 1994, the action, the unlawful action is unreasonable discrimination. Our price differential was rational. I think we showed it to be rational. We didn't just say no to DHX. We said no to a lot. We also said yes. Which leads me to my third and final point, and then I'll be happy to address any questions you may have or revert back to my colleague from the Surface Transportation Board, is that we need to ask what relief the appellant is seeking. What we think they are seeking is a reversion to a lockstep pricing that wasn't even in place in 1994, and whatever we feel about the changes brought on by the ICC Termination Act, if nothing else, we believe that it liberalized the market and that it allowed for greater price competition than existed before. What they are looking for is lockstep pricing in which we have to give every shipper, not just DHX, but every other freight forwarder in a trade and every other shipper in a trade the same rate that we give to Walmart, who ships 30,000 containers a year, or to Dick's Sporting Goods, who may ship 20,000 containers a year. That's a reversion not to 1994, but to 1904, we believe. And no matter how we view ICTA, I can't see it as compelling a result that the current regulatory regime is stricter now than it was before. And I would be happy to address any questions you have on our pricing actions. I might only add that on the question of deceit, we simply believe, and we said below, that there was no deceit. All our rates, and we showed to the STB that these shippers were in the tariff. Every single penny that they paid can be found in the carrier's tariffs. What we did not reveal, when asked by DHX, was the prior to negotiation, a memorandum of understanding which incorporated the terms of our conversation. We agreed, or Matson would agree, to put in a rate of, say, $2,000 a container for a large shipper. And those rates may be predicated on conversations we have. We live in a corporate environment. When I first started out in the freight forwarding business 30 years ago, and that's what I did for 15 years before being demoted to the legal industry, everything was done on a handshake basis. Now, supply chains are complex. Everything is driven by contracts. Everything, everybody needs a lawyer. You go to a Target, you go to a Home Depot, they say, okay, great, you have a Where's the piece of paper that sets out the understanding? And here it is. Here's the piece of paper. It's not to see when one competitor asks what is the reason why you gave another competitor a rate. Why one shipper, why did you give them this rate? All we needed to say was this was the rate. We did not have to tell them what our commercial rationale was for that rate. And with that, I thank you very much. Once again, I'd be happy to address any questions you may have. Any questions? Thank you, counsel. We'll hear rebuttal. If it pleases the Court, I would like to point out that under the ICC Termination Act, regulation was retained over the domestic offshore trades, now called the non-contiguous trades, because Congress found they needed the protections. It is not a deregulated environment. The Board asked for deference on its statutory interpretations, but they haven't provided any statutory interpretations to you. The controlling statutes, 14101A, the Common Carrier Duty Statute, the Filed Rate Doctrine 13702A, they haven't offered any interpretation of that either. The National Transportation Policy, they dismissed as merely a variety of conflicting policies. They applied none of this to their decision in this case. More importantly, a negative does not prove a positive. The remaining statutes do, in fact, overlap. We were not making a per se claim at the Board. That's a rather shallow view. Under the comparative rate analysis, if you have a rate which is out of line with the prevailing market rates, the burden then shifts to the carrier to justify the difference. That's a reasonableness analysis. It's not a per se standard. Judge Fischer, in response to your questions regarding an intent to destroy competition, I would note for the record there's a Matson Memorandum dated June 16th, 1998, which is approximately eight pages long, which goes into a great deal of detail in how they intend to destroy freight forwarder competition. They're starting out by crippling it, and through a series of rate increases and revisions to their tariff are going to make sure that the freight forwarders cannot compete for full container load business. It's a simple matter of business practicality. If a shipper can get a single full container load rate directly from the carrier, why should he deal with a freight forwarder? A freight forwarder has a lot of built-in costs that must be on top. The net effect is you have full price plus 15%. In regarding the issues of the vessel sharing, the ICC Termination Act nor any of the domestic commerce statutes recognize vessel sharing. The contracts themselves, of which there are approximately four, 1997 to 2001 was a set of series, and then the contracts after 2001 describe the relationship as a carrier-shipper relationship for each of these companies with guarantees. The Board's conclusion that they were vessel sharing and permissible under the foreign regulation statutes of the Shipping Act of 1984 is a serious legal error. Thank you. Thank you, counsel. Thank you all for your arguments, and we will be in recess for 10 minutes.
judges: Thomas, Fisher, Gould